

Exhibit 36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHERYL DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-1423 (HHK) |
| ) | |
| MICHAEL CHERTOFF, SECRETARY, ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ) | |
| ) | |
| Defendant. ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1**: State factual and legal basis for the contention in your Complaint ¶ 19 that the Defendant's issuance of a 14 day suspension of Plaintiff's failure to secure her weapon properly was "unduly harsh and much more severe than the discipline issues to similarly situated males, who had lost their weapons stolen from their vehicles or residence."

**ANSWER**: Male employees who had their weapons stolen or lost were not disciplined. Employee Larry Phelps had a loaded gun in his jacket when he was at the gym and noticed it was missing when he went home. Russell Malloy had his service weapon stolen from his minivan parked at home. Andrew Hockett's weapon was stolen from his dresser drawer where it was improperly stored. Anderson Wright failed to properly safeguard and control a weapon in the evidence inventory and failed to initiate the appropriate paperwork to establish a chain of custody for the weapon for investigation and litigation purposes as required under Agency regulations. The male employees were not disciplined even though these were reported incidents.

The GSA/NCR Human Resources Disciplinary Guide states that "in order to be affective, disciplinary action must be initiated in a timely manner. Discipline not taken within reasonable time after the occurrence of the misconduct loses its connection with the misconduct and merely

becomes punitive." Jerry McGill, a criminal investigator, was not disciplined for a DWI while driving a government vehicle in Glynco for a lapse in time of 6 to 9 months. However, Plaintiff received a record of infraction 13 months after the incident and a proposal of suspension 15 months after the incident. Furthermore, the regulations used to discipline her were published 8 months after the incident occurred.

**INTERROGATORY NO. 2**: State factual and legal basis for the contention in your Complaint ¶ 20 that defendant retaliated against plaintiff when plaintiff was "cited for accessing confidential personnel information and reassigned to a less desirable area and relieved of her case processing duties."

ANSWER: Ms. Davis filed an EEO complaint on September 6, 2002. Defendant denied Ms. Davis overtime after she filed the complaint. On Jan 21, 2003, Davis was accused of improperly accessing private and confidential information related to others, subjected to an IG investigation, and reassigned to a less desirable work area (Bldg 202) without a computer. She also had her vehicle taken away and was required to use her own car and gas. 5 other employees who accessed the same information were not disciplined.

GSA did not have established policies which mandates disciplinary actions for accessing disciplinary actions. Program Overview for the GSA Privacy Act Program states that each system manager must set up technical, administrative and physical security measures for processing, storing, transmitting and disposing of personal information. In particular, electronic records are protected by passwords, firewalls and other security measures as determined by system manager and program officials. The information Davis accessed was not secured by a password or secured by the Agency in any way.

Under the GSA Privacy Act & Procedure Guide states under the Standards of Conduct

that "GSA employees have a duty to protect the security of personal information by avoiding any unauthorized disclosure, verbal or written, of records." Davis was not aware that the information was secured personal information because it was available for everyone to see and others had viewed it as well.

**INTERROGATORY NO. 3:** : State factual and legal basis for the contention in your Complaint ¶ 20 that plaintiff's co-worker's who had accessed confidential personnel information were not cited for accessing personnel information.

ANSWER: Jerry McGill, Ira Johnson, Kenneth Morris, Malcolm Weeks and Alexander Peterson repeatedly accessed the same personnel information as Ms. Davis on their respective computers but were never disciplined for their actions. Allison Poore also accessed the information on at least one occasion but was also not disciplined.

**INTERROGATORY NO. 4**: State factual and legal basis for the contention in your Complaint ¶ 20 that the difference in treatment given to plaintiff in comparison to her co-workers for accessing confidential personnel information was motivated by defendant's animosity towards plaintiff because of her EEO complaint.

ANSWER: See answer to Interrogatory No. 2 and 3.

**INTERROGATORY NO. 5**: State fully the type and amount of damages which you allegedly suffered as a result of discrimination or retaliation by the defendant, including but not limited to, compensatory damages, medical expenses, back-pay from pay, and loss of income.

ANSWER: Davis is seeking reimbursement for $3000 which she lost from the suspension. She is seeking overtime losses of $31,580 from 2003 and 2004 when she was reassigned out of her position for having accessed personnel data and was not permitted to perform her investigative duties. She is seeking $500 for loss of use of government vehicle for a period of 5 months. That make whole amount is approximately $35,000. She wants compensatory damages

3

of an equal amount, which brings her total to $70,000. She wants reimbursement for fees and costs. We have about 80 hours in the case and Ms. Davis would be like to be reimbursed for fees and costs.

**INTERROGATORY NO. 6**: If you have filed any complaints, charges or grievances against any employer in the last 10 years, list the date of each such complaint, charge or grievance; the basis of such complaint, charge or grievance; name and address of the employer against whom it was filed; the name of the forum or court in which it was filed; the outcome of any investigation or other proceeding resulting from the complaint, charge or grievance.

ANSWER: Around 1994, Ms. Davis filed a sexual harassment and retaliation complaint against General Services Administration with the Agency EEO office. The complaint was processed in 1997.

**INTERROGATORY NO. 7**: If you have made a claim for compensatory or other monetary damages against anyone for any reason in the last 10 years, state the date of each such damage claim, the amount of damages claimed, the name and address of the person against whom the claim was filed, the nature and basis of the claim, the name of the court or forum in claim was filed, and the outcome of any investigation or other proceeding resulting from the claims(s).

ANSWER: Davis was in an auto accident in August 2003. Ms. Davis filed a claim in Maryland Circuit Court for Prince George's County and there was a no fault finding.

**INTERROGATORY NO. 8**: With respect to any expert witnesses, you intend to call as a witness at a trial of this case and provide brief statement of the witness' expected testimony.

ANSWER: Complainant intends to call her treating physicians, but Complainant will call them as facts witnesses to substantiate her pain and suffering as opposed to expert witnesses. Dr. Victor Herry is one of Ms. Davis' treating physician and can testify about her pain and suffering in the last 4 years.

4

**INTERROGATORY NO. 9**: Identify each person, other than expert witnesses, you intend to call as a witness at a trial of this case and provide a brief statement of the witness' expected testimony.

**ANSWER**: Ms. Davis will testify about the discrimination she experienced when she was suspended for an offense her male co-workers were not. She will also testify that after she filed her EEO complaint to challenge her suspension, she experienced retaliation by being assigned to administrative duties and refused overtime. Davis will also testify about her pain and suffering.

Ronald Coleman, Range Master, will testify that male employees have lost their weapons or had them stolen and there are incident reports in most cases. He can also testify that when Anderson Wright misplaced a weapon that was in his custody, there was no incident report filed.

Larry Phelps, Special Agent, will testify that he had a loaded gun in his jacket when he was at the gym and noticed it was missing when he went home. He will also testify that he was never disciplined for failing to secure his weapon or having it stolen. He only filed an incident report.

Russell Malloy, Police Officer, will testify that he had his service weapon stolen from his minivan parked at home. He was not disciplined either.

Andrew Hockett, Police Officer, will testify that his weapon was stolen from his dresser drawer where it was improperly stored. He was not disciplined for failing to secure his weapon.

Andrew Readen, Lieutenant, will testify that his weapon was stolen from his house. He was not suspended.

Gerry McGill, Special Agent, will testify that he accessed the information that was said to be confidential on more than one occasion. However, he was never investigated or disciplined.

McGill can also testify that Ronald Blocker, Special Agent in charge, and Mr. John Baker, denied Ms. Davis overtime and supervisory responsibilities. Mr. McGill can testify that Mr. Blocker kept Ms. Davis from working with the Intelligence squad although she is a part of that team, limiting her ability to get the requisite experiences in her division to become a supervisor. Remaining in the Major Crimes division required her to work under Mr. Baker and subjected her to further discrimination and retaliation. Mr. McGill can also testify that John Baker questioned him about giving Ms. Davis a ride in a government car and ordered him to not give her any rides.

Ira Johnson, Special Agent, heard Mary Burnett, Supervisory Special Agent, tell Ms. Davis that she had to do assignments from both the Intelligence Division and Major Crimes Division unlike any other agent. Johnson will also testify that Burnett and Blocker questioned him about picking Davis up from home. They tried to intimidate him into staying away from her. He can also testify that male co-workers whose weapons were stolen were not suspended.

Lisa Burton, Supervisory Special Agent in charge of Intelligence Squad, can testify that although Ms. Davis was the Regional Intelligence Agent for the Intelligence Squad, she was not allowed to work with the rest of the squad but kept under Mr. Baker's supervision in the Major Crimes Squad.

Malcolm Weeks, Special Agent, will testify that he accessed the information that was said to be confidential on more than one occasion. However, he was never investigated or disciplined. He can also testify that male co-workers whose weapons were stolen were not suspended.

Lisa Thatcher, Investigative Aid, can testify that she was allowed to ride in government vehicle with investigators unlike Ms. Davis when she was assigned administrative duties.

Donald Green, Case Management Specialist, can testify that Ms. Davis was assigned to

Case Management Division and denied access to computer and phones.

Phyllistine Cunningham, that Baker kept a close watch on Ms. Davis even when she was reassigned to a separate building and that Ms. Cunningham had to ask Mr. Baker if Ms. Davis could take extra time to take lunch for her birthday even though employees were regularly allowed to take extended lunches on such occasions.

**INTERROGATORY NO. 10:** Identify all witnesses to any facts, issues, or damages related to your complaint, and the nature and details of each person's knowledge.

**ANSWER:** Director Andre Jordan, the deciding official on Ms. Davis' suspension, can testify that Ms. Davis spoke to him about the disparate treatment she experienced in comparison to her male co-workers when she was proposed for suspension for losing her weapon. Ms. Davis informed him that other male officers who lost their weapons were not disciplined. She also reminded him that a male officer was not disciplined for a DWI while driving a government vehicle because the Agency did not make a determination within 9 months of the incident, but the Agency decided to discipline Ms. Davis 13 months after her incident.

John Baker can testify that Ms. Davis was denied overtime, assigned to administrative duties and charged leave for being late from lunch for a few minutes. He also followed her around, criticized her and yelled at her constantly.

Ronald Blocker can testify about the investigation the Agency conducted that led to Plaintiff's suspension and assignment to administrative duties. He can also testify that Ms. Davis was not granted overtime after she filed an EEO complaint. Blocker can testify as to the other employees who viewed the same personnel information on their computer and yet were not disciplined for accessing confidential information.

7

Mary Burnett can testify that she and Mr. Blocker spoke to Mr. Johnson, Ms. Davis' co-worker and asked him not to give her ride in government vehicles. Also, Ms. Burnett who was the head of the Intelligence Squad, can testify that Ms. Davis was an Intelligence Officer who was asked to work for the Major Crimes squad unlike any other Investigation Officer and therefore, was given more assignments than other officers as well as refused responsibilities in the Investigation Squad that would enable her to progress in her career.

**INTERROGATORY NO. 11:** If you have undergone and received any treatment for any mental, psychological, or emotional disturbance, or physical manifestation thereof as a result of the conduct at issue in this action, please identify the nature and extent of such treatment; each doctor, psychiatrist, psychologist, practitioner, hospital or counselor who treated you; each diagnosis and the dates of diagnosis made by any such practitioner; prognosis; and the dated and costs of such treatment.

ANSWER: In January 2003, immediately after Ms. Davis was reassigned to an administrative position, her doctor at the George Washington Hospital treated her for chest pain, stress, insomnia and loss of consciousness.

In February, 2003, Dr. Victor Herry and one of his associates diagnosed Ms. Davis with hypertension and anxiety. She continues to have high blood pressure that has to be controlled by medication.

**INTERROGATORY NO. 12:** If you seek compensatory damages for mental, psychological, or emotional distress, or injury, please describe in detail any distress/injury you have suffered and specify; (a) each and every way emotional, mental, or psychological distress has manifested itself; (b) dates of such manifestations and any witnesses to such manifestations; © any and all physical symptoms suffered and dates suffered.

ANSWER: See answer to Interrogatory No. 11. Also, in January, 2003, when the Agency started intimidating Ms. Davis' co-worker into staying away from her, in retaliation for her filing an EEO complaint, Ms. Davis began to have insomnia. On February 11, 2003, Ms. Davis was

8

ANSWER: See attachment 2 in Plaintiff's Response to Defendant's First Set of Requests for Production of Documents. See also ROI Exh. No. 1, formal complaints of discrimination dated September 6, 2002 and March 3, 2003; ROI Exh. No. 2 (a), Federal Protective Service Operational Guidelines excerpts related to storage of firearms, dated January 2002, GSA Order OAD 5410.10.1, dated April 2000 regarding maintaining discipline and excerpts from GSA/NCR Disciplinary Desk Guide and Table I of the GSA Penalty Guide; ROI Exh. No. 2 (b), GSA guidelines governing authorized access to computer information; ROI Exh. No. 5, Plaintiff's Affidavit; ROI Exh. No. 17, packet of suspension for complainant; ROI Exh. No. 18, relating to overtime hours; ROI Exh. No. 26 and 27, GSA Privacy Act guidelines and ROI Exh. No. 45, regulations governing overtime.

Respectfully submitted,

*/s/ James L. Kestell*
James L. Kestell D.C. Bar # 955310
Jonathan Gould D.C. Bar # 491052
Kestell & Associates
1012 14th Street, N.W., Suite 630
Washington, D.C. 20005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this ____4th____ day of May, 2006, a true and correct copy of the foregoing Plaintiff's Response to Defendant's First Set of Interrogatories has been sent by first class mail to:

Wyneva Johnson
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530

_____
James L. Kestell D.C. Bar # 955310
Jonathan Gould D.C. Bar # 491052
Kestell & Associates
1012 14th Street, N.W., Suite 630
Washington, D.C. 20005